## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | | |
|---|---|---|
| Marvin Moody,<br>    Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | 1:12cv583 (GBL/JFA) |
| | ) | |
| Alisa Williams, et al., | ) | |
|     Defendants. | ) | |

### MEMORANDUM OPINION

This Matter comes before the Court on defendants Branch and Burnett's joint Motion for Summary Judgment, docket # 77, and defendants Cushionberry, Motsumi Moja, Nixon, Williams, Alisa Williams, and Carolyn Williams's joint Motion for Summary Judgment, docket # 80. Marvin Moody, a Virginia inmate proceeding pro se, has filed a civil rights action, pursuant to 42 U.S.C. § 1983. By Order dated June 29, 2012, the Court dismissed with prejudice plaintiff's retaliation claim. The Court then dismissed without prejudice defendants Muhammad and Pabla pursuant to Fed. R. Civ. P. 4(m), by Orders dated February 12, 2013 and February 25, 2013, respectively. Defendants Branch and Burnett filed their joint Motion for Summary Judgment on May 14, 2013, and gave plaintiff the notice required by Local Rule 7(K) and Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975). Defendants Cushionberry, Motsumi Moja, Nixon, Williams, Alisa Williams, and Carolyn Williams filed their joint Motion for Summary Judgment on May 16, 2013 and gave plaintiff the notice required by Local Rule 7(K) and Roseboro. Plaintiff has filed an opposition to both of the motions. For the reasons below, defendants Branch and Burnett's joint Motion for Summary Judgment will be granted, in part, and denied, in part. Defendants Cushionberry, Motsumi Moja, Nixon, Williams, Alisa Williams, and Carolyn Williams's joint Motion for Summary Judgment will be granted.

## I. Background

Plaintiff's Statement of Fact

Plaintiff alleges that since June 2011, he has sought medical treatment for "an unknown heart condition," that causes him to shake, experience uncomfortable vibrations, and causes slight numbness and pressure in his chest. Compl. at 5, ECF No. 1. He also alleges that his condition has also affected his ability to sleep because he feels as if his heart will "stop beating" when he lies down. Id. at 5.

In August 2011, plaintiff met with the jail psychiatrist, defendant Alisa Williams. Id. at 6. Plaintiff alleges that his entire conversation with her was based "solely on [his] heart." Id. Defendant Alisa Williams prescribed anti-anxiety medication for plaintiff. Id. According to plaintiff, the medication had several negative side effects, which included causing him to shake and go into "dazes." Id. Plaintiff tried three different anti-anxiety medications over the next six months.

Around September 26, 2011, plaintiff alleges that he explained to defendant Carolyn Williams, the medical director, that he wanted to go to the hospital to have his heart examined. Id. at 5. Defendant Carolyn Williams allegedly told plaintiff that he could not go to the hospital because it was "costly" and the company would not approve it. Id. at 5-6.

On May 8, 2012, plaintiff was seen by defendant Motsumi Moja, the doctor at Richmond City Jail during the incidents of which plaintiff complains. Id. at 6. During the appointment, plaintiff explained to defendant Motsumi Moja that he had been experiencing "jumping of [his] heart." Id. at 7. Without performing any diagnostics, defendant Motsumi Moja, allegedly, told plaintiff "you look fine, I'm sure everything will be okay." Compl. at 7. When plaintiff continued

2

to insist that he was suffering from heart issues, defendant Motsumi Moja asked defendant

Williams, a nurse at Richmond City Jail, to perform an EKG. Am. Compl. 6 of 10. According to

plaintiff, defendant Williams was "in shock" when she looked at the EKG results. Defendant

Williams, allegedly, rushed over to defendant Motsumi Moja, and he told her to "get rid of that

print out." Compl. at 7. Defendant Motsumi Moja then asked defendant Williams if she "know[s]

how to make it look better." Defendant Williams then told plaintiff she was going to do another

check because the first one did not come out correctly. Id. at 7. At that time, plaintiff alleges that

defendant Williams began acting strangely and "stumbling over words." Finally, defendant

Williams allegedly told defendant Motsumi Moja that she "couldn't do it." Id.

Defendant Motsumi Moja then called over defendant Cushionberry and told defendant

Cushionberry there was a problem. Defendant Cushionberry began "messing with" the EKG

machine and plaintiff asked defendant Cushionberry if something was wrong. Id. Before

defendant Cushionberry could respond defendant Nixon, a deputy sheriff at Richmond City Jail

who escorted plaintiff to his medical appointment that day, told defendant Cushionberry to tell

plaintiff the "truth" because plaintiff already knew what was going on. Id. at 7-8. Eventually,

defendant Cushionberry obtained a new EKG printout, which showed no problems with plaintiff's

heart. Id. at 8. Plaintiff, however, alleges that the new printout was done "to deceive and [make it]

appear that nothing is wrong." Id. Plaintiff told defendant Motsumi Moja he knew that his heart

results were "faked." Am. Compl. 6 of 10; Pl's Opp'n Mot. Summ. J. 5.

In May 2012, plaintiff again met with defendant Alisa Williams and she allegedly told him

she would no longer prescribe anti-anxiety medication for him because he did not have anxiety

problems. Compl. at 6. Plaintiff states that "Alisa Williams knew she was prescribing brain meds

3

for [plaintiff's] heart condition." Compl. at 6.

Plaintiff's allegations become somewhat difficult to follow, but it appears that he filed several grievances after his appointment with defendant Motsumi Moja. Id. at 8. Once defendant Motsumi Moja obtained knowledge of the grievances he allegedly "created false information by saying that [plaintiff] had violated jail rules and said disrespectful things during appointment[s]." Id. at 9. As a result, defendants Burnett and Branch placed plaintiff in segregation. Plaintiff alleges that his placement into segregation was retaliation. Id. at 9.

Plaintiff also alleges that defendants Burnett and Branch deprived him of liberty and due process when they placed him in segregation because they only told [him that] 'the doctor said you did something disrespectful.'" Id. He alleges that he was not scheduled for an institutional disciplinary hearing prior to his placement into administrative segregation. Id. On or about June 29, 2012, defendant Burnett moved plaintiff out of segregation and placed him in a cell that is "very dark with no lights and a wall in front of it that blocks light making it hard to see." Dec. 28, 2012 Am. Compl. 2. Plaintiff's cell is also next to the shower area and water from the showers "fills [his] cell . . . with toxic fumes because it is dirty water from inmates bodies." Id. Plaintiff alleges that as a result he cannot breathe properly and his "heart feels like it has tightened." Id. Plaintiff alleges that defendant Burnett has housed plaintiff in the worst of the over 70 rooms at his institution. Id.

On August 7, 2012, plaintiff alleges that the United States Marshall Service ("USMS") removed him from the jail and took him to multiple medical appointments, during which time "licensed doctors" assessed plaintiff's condition and prescribed blood pressure medicine. Dec. 28, 2012 Am. Compl. 2 The USMS returned plaintiff to the Richmond City Jail on August 23, 2012.

Id. Upon his return, defendant Motsumi Moja, allegedly, did not allow plaintiff to have his blood pressure medicine despite plaintiff telling defendant Motsumi Moja that when he lays down he "begins to shake more and [his] heart bangs rapidly." Id. Plaintiff also alleges that after he was transferred to the Virginia Department of Corrections ("VDOC") in October 2012, defendant Motsumi Moja failed to transfer his medical records. Id. at 3. Plaintiff states that he is "at a higher risk of damage due to [defendant] Moja's failure to provide prescribed medicines and medical records."

Plaintiff alleges that on December 1, 2012, VDOC medical staff rushed him to the emergency room after he was "shaking" and had "irregular heartbeats combined with high blood pressure." Id. He states that VDOC and emergency room personnel looked for his medical records but were unable to find them because defendant Motsumi Moja has "hidden evidence of [his] condition." Id. As relief, plaintiff seeks monetary damages and injunctive relief. Compl. at 10.

Defendants Statement of Facts

Defendant's allegations parallel plaintiff's. On October 24, 2011, defendant Alisa Williams, a psychiatrist at Richmond City Jail, evaluated plaintiff and concluded that he was suffering from a non-specific anxiety disorder. Alisa Williams Aff. ¶ 7. Defendant Alisa Williams again saw plaintiff on November 22, 2011, and plaintiff reported that the medication had helped "soothe" him but that it was no longer helping. Id. at ¶ 8. Plaintiff requested his prescription be switched to Zoloft for anxiety because "other inmates liked it," and defendant Alisa Williams changed his prescription. Id. When defendant Alisa Williams next saw plaintiff on May 7, 2012, plaintiff complained of heart problems. Id. at ¶ 11. She concluded that the anti-anxiety medication had not helped plaintiff, and she discontinued his prescription. Id.

5

Defendant Motsumi Moja states that he first evaluated plaintiff on November 18, 2011, to treat an ingrown toe nail. Moja Aff. ¶ 5. Defendant Motsumi Moja prescribed Augmentin and then scheduled a follow-up appointment for November 22, 2011. Id. at ¶ 6. Plaintiff did not complain of heart-related issues on that date. Id. Nor did he complaint of cardiac problems on either November 30, 2011 or December 5, 2011, when defendant Motsumi Moja again saw plaintiff to help treat his ingrown toe nail. Id. at ¶¶ 7-8. When defendant Motsumi Moja saw plaintiff on December 5, 2011, plaintiff denied having any chest pain. Id. at ¶ 8. Though defendant Motsumi Moja again saw plaintiff on December 13th and 14th of 2011, for continued treatment on his foot, plaintiff did not report any heart-related problems on either date. Id. at ¶ 9.

Plaintiff first complained of heart palpitations on February 24, 2012, though at that time he denied having chest pain. Id. at ¶ 12. Defendant Motsumi Moja ordered an EKG that same day, which was performed on February 29, 2012. Id. The EKG results were normal. Id. Plaintiff continued to complain of heart problems on both the 1st and 8th of May 2012. Id. at ¶¶ 14-15. His vital signs were taken on both occasions and were within the normal range. Id. In an abundance of caution, defendant Motsumi Moja ordered another EKG test.

On May 8, 2012, defendant Cushionberry briefly adjusted the EKG machine during plaintiff's exam because the EKG was printing in a font that was too large and the results were printing off the page. Cushionberry ¶ 6; Williams Aff. ¶ 7. After the printing problem was fixed, defendant Williams ran plaintiff's EKG test, which produced normal results. Moja Aff. ¶ 16. When defendant Motsumi Moja advised plaintiff that his results were normal he "became belligerent, stomped out of the clinic, and stated 'I will F- with your license.'" Id. Defendant Motsumi Moja ordered labs to determine whether there could be another source of the

6

palpitations of which plaintiff complained, but the results were all within normal range. Id. at ¶ 17.

On June 22, 2012, defendant Motsumi Moja ordered an echocardiogram because plaintiff was still complaining of heart problems and stated that his heart was "about to jump out of his chest." Id. at ¶¶ 18-19. On July 26, 2012, plaintiff had an echocardiogram on his heart and a local cardiologist Dr. Robert Levitt interpreted the results. Id. at ¶ 19. Dr. Levitt concluded that plaintiff had normal structures in the heart and normal cardiac function. Id.

On August 3, 2012, defendant Motsumi Moja had his last appointment with plaintiff after plaintiff complained that his right toe was bleeding and that his heart was "jumping out of [his] chest." Id. at ¶ 20. Defendant checked plaintiff's vital signs, which were normal. Id. Defendant Motsumi Moja states that he never prescribed blood pressure medication and never received "records or communications from another facility that [plaintiff] had been diagnosed with Hypertension or any cardiac disease." Id. ¶ 21. Defendant Motsumi Moja's last day at the Richmond City Jail was October 6, 2012. Id. ¶ 23. Defendant Motsumi Moja states that he never hid any of plaintiff's medical records and had no contact with any of his records after his August 3, 2012 consultation with plaintiff. Id. ¶ 24.

## II. Standard of Review

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that judgment on the pleadings is appropriate. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (moving party

bears the burden of persuasion on all relevant issues). To meet that burden, the moving party must

demonstrate that no genuine issues of material fact are present for resolution. Id. at 322. Once a

moving party has met its burden to show that it is entitled to judgment as a matter of law, the

burden then shifts to the non-moving party to point out the specific facts which create disputed

factual issues. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Matsushita Electrical

Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In evaluating a motion for

summary judgment, a district court should consider the evidence in the light most favorable to the

non-moving party and draw all reasonable inferences from those facts in favor of that party.

United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Those facts which the moving party bears

the burden of proving are facts which are material. "[T]he substantive law will identify which facts

are material. Only disputes over facts which might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

An issue of material fact is genuine when, "the evidence . . . create[s] [a] fair doubt; wholly

speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355,

364 (4th Cir. 1985). Thus, summary judgment is appropriate only where no material facts are

genuinely disputed and the evidence as a whole could not lead a rational fact finder to rule for the

non-moving party. Matsushita, 475 U.S. at 587.

      "When a motion for summary judgment is properly made and supported . . ., an opposing

party may not rely merely on allegations or denials in its own pleading; rather, its response must

... set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

Unsubstantiated, conclusory claims without evidentiary support are insufficient to satisfy a

non-moving party's burden on summary judgment. Carter v. Ball, 33 F.3d 450, 461-62 (4th Cir.

1994); Goldberg v. B. Green & Co., 836 F.2d 845, 848 (4th Cir. 1988).

### III. Defendants Burnett and Branch's joint Motion for Summary Judgment

While plaintiff's allegations are not always clear, a liberal reading shows he brings four

claims against defendants Burnett and Brach:   (A) defendants denied him due process when they

placed him into administrative segregation, (B) his conditions of confinement amount to cruel and

unusual punishment, (C) his being moved into segregated housing constituted retaliation, and (D)

his rights were violated when he was denied use of the prison's grievance system. The Court will

address each claim in turn. For the reasons stated below, defendants Burnett and Brach's joint

Motion for Summary Judgment will be granted, in part, and denied, in part.

A. Due Process

The Due Process Clause of the Fourteenth Amendment provides that no State shall

"deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend.

XIV, § 1. To prevail on either a procedural or substantive due process claim, inmates must

demonstrate that they were deprived of "life, liberty, or property" by governmental action. See

Plyler v. Moore, 100 F.3d 365, 374 (4th Cir. 1996).

Plaintiff alleges that that defendants Burnett and Branch deprived him of his "liberty and

due process" when they placed him into administrative segregation. Compl. 9. He then states that

he is "continuously, day after day" put into segregation "possibly months or years." Id. He then

alleges that when he was put into segregation defendants Brunette and Branch "only told [him that]

'the doctor said you did something disrespectful.'" Id. He states that the charges were not

explained to him and that he was not given an "opportunity to present [his] views." Id. He alleges

that he is in segregation "without procedures being used." Id. Though related, plaintiff brings three

9

distinct claims as to how his due process rights were violated:   (1) by his mere placement into

segregation, (2) by the amount of time he was held in segregation, and (3) by not having the proper

disciplinary proceedings prior to his being confined in segregation. Each will be discussed in turn.

Claim 1

To the extent that plaintiff argues his mere placement into administrative segregation

violates his due process rights, this argument is foreclosed by Baker v. Lyles and will be

dismissed. 904 F.2d 925, 931 (4th Cir. 1990) (recognizing that administrative segregation is not a

situation in which an inmate has "as interest independently protected by the Due Process Clause"

and that "administrative segregation is the sort of confinement that inmates should reasonably

anticipate receiving at some point in their incarceration.").

Claim 2

States may under certain circumstances create liberty interests which are protected
by the Due Process Clause. But these interests will be generally limited to freedom
from restraint which, while not exceeding the sentence in such an unexpected
manner as to give rise to protection by the Due Process Clause of its own force,
nonetheless imposes atypical and significant hardship on the inmate in relation to
the ordinary incidents of prison life.

Sandin v Conner, 515 U.S. 472, 483-84 (1995) (citations omitted). "To determine whether [an]

inmate[] possessed a liberty interest, we must compare the conditions to which they were exposed

in administrative segregation with those they could expect to experience as an ordinary incident of

prison life." Beverati v. Smith, 120 F.3d 500, 502 (4th Cir. 1997).

Here defendants have shown that the conditions of plaintiff's placement into segregation

were not so atypical of those that are an ordinary incident of prison life. While in administrative

segregation, plaintiff had access to mail and a variety of services, including educational, library,

10

counseling, religious, and medical. Burnett. Aff. ¶¶ 9. These same services are also available to the general public. Id. at ¶ 8. Though plaintiff asserts that he was in segregation "continuously, day after day . . . possibly months," defendants have shown that plaintiff was in segregation from May 11, 2012 until May 18, 2012 – a total of seven days. Bassfield Aff. ¶ 14. Such a period of time did not violate plaintiff's due process rights. See Beverati, 120 F.3d at 502 (holding that a six-month placement into administrative segregation did not violate the inmate's due process rights). As such, this claim will be dismissed.

    Claim 3

    When a loss of statutory good-time credits or placement in solitary confinement is at issue, the Supreme Court has mandated procedural safeguards for prison disciplinary hearings, including advance written notice of charges, written findings, and an opportunity, when consistent with institutional safety and correctional goals, for the inmate to call witnesses and present evidence in his defense. Wolff v. McDonnell, 418 U.S. 539, 563–67 (1974).   The Sandin Court, however, later viewed Wolff as holding such safeguards were necessary when "a shortened prison sentence" was implicated, without addressing placement into solitary confinement. 515 U.S. 472, 477 (1995) ("[In Wolff w]e held that the Due Process Clause itself does not create a liberty interest in credit for good behavior, but that the statutory provision created a liberty interest in a "shortened prison sentence" which resulted from good time credits, credits which were revocable only if the prisoner was guilty of serious misconduct.).

    The Eighth and Fifth Circuits have, thus, read Sandin as obviating any need for a hearing prior to an inmate's placement into segregation. Kennedy v. Blankenship, 100 F.3d 640, 642–43 (8th Cir.1996); Pickens v. Minton, 109 Fed.Appx. 655, 656, 2004 WL 1842640 (5th Cir.2004)

(unpublished); <u>Baker v. Lyles</u>, 904 F.2d 925, 929 (4th Cir. 1990). The Second Circuit, however, has declined to read <u>Sandin</u> as creating a "<u>per se</u> blanket rule that disciplinary confinement may never implicate a liberty interest. <u>Mille v. Selsky</u>, 111 F.3d 7, 9 (2nd Cir. 1997). Similarly, the DC Circuit read <u>Sandin</u> as implicating a "liberty interest" in segregation that is "protected by the Due Process Clause of the United States Constitution only if it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" <u>Hatch v. District of Columbia</u>, 184 F.3d 846, 846 (D.C. Cir. 1999).

While the Fourth Circuit has not explicitly addressed whether <u>Sandin</u> obviated a need for a hearing prior an inmate's placement into segregation, it has used the reasoning in <u>Sandin</u> to decide that such placement does not "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." <u>Beverati</u>, 120 F.3d at 502. Further, the Fourth Circuit has narrowly read <u>Wolff</u> itself as only applying "when a state creates a protected liberty interest in good-time credits." <u>Ewell v. Murray</u>, 11 F.3d 482, 488 (4th Cir. 1993) (emphasis in original). Indeed, the Fourth Circuit has stated that prison "inmates do not have a protected liberty interest in the disciplinary hearing procedures <u>themselves</u>, only in the subject matter to which they are directed." <u>Id.</u> (emphasis in original).

Defendants did not respond to plaintiff's allegation that he was in "segregation without procedures being used." Compl. 9. As such, there still exists an issue of material fact as to whether plaintiff's disciplinary hearing itself, or lack of one, implicated plaintiff's due process rights. Defendants' Motion for Summary Judgment will be denied as to this issue but defendants will be permitted to file a supplemental briefing as to whether plaintiff was afforded the protections required by <u>Wolff</u> and, if not, whether such protections are required after <u>Sandin</u>.

12

## B. Conditions of Confinement

To establish a claim for cruel and unusual punishment due to conditions of confinement that violate the Eighth Amendment, a plaintiff must allege facts sufficient to show (1) an objectively serious deprivation of a basic human need, that is, one causing serious physical or emotional injury, and (2) that prison officials were deliberately indifferent to that need.   Farmer v. Brennan, 511 U.S. 825, 834 (1994); Wilson v. Seiter, 501 U.S. 294, 198 (1991).    To meet the first prong, plaintiff must allege facts sufficient to show that the condition complained of was a "sufficiently serious" deprivation of a basic human need.   Farmer, 511 U.S. at 834) (citing Wilson, 501 U.S. at 298).    Only extreme deprivations will make out an Eighth Amendment claim, and it is plaintiff's burden to allege facts sufficient to show that the risk from the conditions of his confinement was so grave that it violated contemporary notions of decency and resulted in serious or significant physical or emotional injury.   Hudson v. McMillian, 503 U.S. 1, 8 (1992); Strickler v. Waters, 989 F.2d 1375, 1379-81 (4th Cir. 1993).   To meet the second prong, plaintiff must allege facts sufficient to show that defendants were deliberately indifferent, that is, that they knew of facts from which an inference could be drawn that a "substantial risk of serious harm," was posed to his health and safety, that they drew that inference, and then disregarded the risk posed. Farmer, 511 U.S. at 837.

Plaintiff's alleges that his cell was infested with rodents, bird feces, urine, compl. 9, without lighting, Dec. 28, 2012 am. compl. 2, and is filled with "toxic fumes" from being near the showers, Dec. 28, 2012 am. compl. 2. In Beverati v. Smith,[1] the Fourth Circuit noted that a

---

[1]  While defendants' cite this case as holding that such conditions do not give rise to an Eighth Amendment claim, such a reading is in error. The Fourth Circuit explicitly noted that those conditions were analyzed not under an Eighth Amendment claim, because no harm was alleged and, as such, it would have failed, but under a Due Process Clause claim. 120 F. 3d at 504 n.5.

six-month stay in cells that were "infested with vermin; were smeared with human feces and urine; and were flooded with water from a leak in the toilet on the floor above" did not rise to an extreme deprivation where there was no showing of serious physical or emotional injuries or the grave risk of such harm. 120 F. 3d 500, 504 n.5. Similarly, plaintiff does not allege what harm he suffered *as a result* of the conditions of his confinement. While he does complain of a heart condition he does not allege that this was a result of his conditions of confinement; rather, he complains that this is an ongoing medical condition for which he was being denied medical care. Compl. 5-9; Dec. 28, 2012 am. compl. 2. Further, defendants have submitted evidence that contradict's plaintiff contention; namely, that the institution regularly treated for pests and vermin. Uzel Aff. ¶¶ 3, 4. As such, there is no issue of material fact as to the conditions of plaintiff's confinement and defendants Burnett and Branch's joint summary judgment motion will be granted as to this issue.

C. Retaliation

For the reasons stated in the Court's Order dated June 29, 2012, defendants Burnett and Branch's joint summary judgment motion will be granted as to this issue.

D. Right to Prison Grievance System

To the extent plaintiff seeks to make a First Amendment claim, this must be dismissed because he has no constitutional right to use the prison grievance process. See Adams v. Rice, 40 F.3d 72, 75 (4th Cir.1994). As such, Burnett and Branch's joint summary judgment motion will be granted as to this issue.

### IV. Defendants Cushionberry, Motsumi Moja, Nixon, Williams, Alisa Williams, and Carolyn Williams's Joint Motion for Summary Judgment

Plaintiff alleges that defendants Cushionberry, Motsumi Moja, Nixon, Williams, Alisa Williams, and Carolyn Williams were deliberately indifferent to his medical needs. To state a

14

claim for deliberate indifference to serious medical needs that rises to the level of a constitutional violation, a plaintiff must allege two distinct elements. First, he must allege a sufficiently serious medical need.   See, e.g., Cooper v. Dyke, 814 F.2d 941, 945 (4th Cir. 1987) (determining that intense pain from an untreated bullet wound is sufficiently serious); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978) (concluding that the "excruciating pain" of an untreated broken arm is sufficiently serious). Second, he must allege deliberate indifference to that serious medical need.

Under this second prong, an assertion of mere negligence or even malpractice is not enough to state an Eighth Amendment violation; instead, plaintiff must allege deliberate indifference "by either actual intent or reckless disregard." Estelle, 429 U.S. at 106; Daniels v. Williams, 474 U.S. 327, 328 (1986); Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). The prisoner must demonstrate that defendants' actions were "[s]o grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Id. (citations omitted).   Significantly, a prisoner's disagreement with medical personnel over the course of his treatment does not make out a cause of action. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985).

Plaintiff has failed to meet his burden on summary judgment of establishing any genuine issue of material fact for trial. Defendants Cushionberry, Motsumi Moja, Nixon, Williams, Alisa Williams, and Carolyn Williams' joint motion for summary judgment, including the affidavits from all of the defendants and the attached uncontested medical records, demonstrate that none of the defendants violated plaintiff's Eighth Amendment rights. Although the Court must construe all inferences in the light most favorable to the plaintiff, the non-moving party may not defeat a properly-supported summary judgment motion by simply substituting the "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." Lujan v.

15

Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990). Even where the non-moving party in such a situation is a pro se prisoner entitled to liberal construction of his pleadings, a "declaration under oath ... is not enough to defeat a motion for summary judgment. He has to provide a basis for his statement. To hold otherwise would render motions for summary judgment a nullity." Campbell-El v. Dist. of Columbia, 874 F.Supp. 403, 406 - 07 (D.C. 1994). Here, plaintiff submitted nothing more than a declaration under oath that repeated the same allegations that were in his original and amended complaints.

Plaintiff's Allegations Against Defendants Moja, Williams, and Cushionberry

As an initial matter, plaintiff's allegation that defendants refused to treat his alleged heart conditions, prescribed him anxiety medication instead of examining his heart, and fabricated an EKG test are all flatly contradicted by the evidence. Plaintiff was repeatedly provided medical care by defendant Motsumi Moja for an ingrown toe nail, including on November 18, 2011, November 22, 2011, November 30, 2011, December 5, 2011, December 13, 2011, and December 14, 2011. Moja Aff. ¶¶5-8. On multiple occasions, defendant Motsumi Moja ordered medication and foot soaks for the in-grown toe nail. Id. Plaintiff did not complain of any heart related problems on any of those dates and he denied having any chest pain on December 5, 2011. Id. at ¶ 8.

Indeed, plaintiff did not first complain of heart palpitations until February 24, 2012, though at that time he denied having chest pain. Id. at ¶ 12. On that very day, defendant Motsumi Moja ordered an EKG, which was performed on February 29, 2012. Id. The EKG results were normal. Id. While plaintiff continued to complain of heart problems on both the 1st and 8th of May 2012, his vital signs were taken on both occasions and were within the normal range. Id. ¶¶

16

14-15. Still, defendant Motsumi Moja ordered another EKG test.

On May 8, 2012, defendant Cushionberry briefly adjusted the EKG machine during plaintiff's exam because the EKG was printing in a font that was too large and the results were running off the paper. Cushionberry ¶ 6; Williams Aff. ¶ 7. After the printing problem was fixed, defendant Williams ran plaintiff's EKG test, which produced normal results. Moja Aff. ¶ 16. While plaintiff insists that defendants Williams, Motsumi Moja, and Cushionberry "faked" his results, this assertion is not supported by any evidence. Defendants Williams, Motsumi Moja, Cushionberry, and Nixon all submitted sworn affidavits stating that they did not in any way tamper with the EKG machine or plaintiff's results. Moja Aff. ¶ 25; Williams Aff. ¶ 10; Cushionberry ¶ 6; Nixon Aff. ¶ 7.

In sum, the evidence shows that defendant Motsumi Moja saw plaintiff no less than twelve times between November 2011 and August 2012. Moja Aff. ¶¶ 5-19. During this time, Motsumi Moja ordered two EKG exams, cardiac labs, an echocardiogram, took vital signs, addressed plaintiff's in-grown toe nail, and ordered pain medication for plaintiff. Far from acting in a manner so "grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness," defendant Motsumi Moja, provided prompt and attentive care to plaintiff. See Estelle, 429 U.S. at 106. Similarly, defendants Williams and Cushionberry did not engage in actions that were "[s]o grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Id.

Though plaintiff alleges that Motsumi Moja interfered with his medical records and failed to transfer them to his new institution, the evidence shows that Motsumi Moja was no longer employed at the Richmond City Jail when plaintiff was transferred to VDOC on October 16,

17

2012. As such, defendants Moja, Williams, and Cushionberry are entitled to summary judgment on plaintiff's claim of deliberate indifference.

Defendant Nixon

It requires little discussion to conclude that defendant Nixon can have no liability to plaintiff for the claim of deliberate indifference plaintiff asserts. In this circuit, "a medical treatment claim cannot be brought against non-medical personnel unless they were personally involved with a denial of treatment, deliberately interfered with prison doctors' treatment, or tacitly authorized or were indifferent to the prison physicians' misconduct." Lewis v. Anemone, 926 F.Supp. 69, 73 (W.D. Va. 1996), citing Miltier, 896 F.2d 848; accord, Boblett v. Angelone, 957 F.Supp. 808, 813 (W.D. Va. 1997). No such circumstances have been shown to have existed here. Further, Nixon did not fail to intervene in defendants Moja, Williams, and Cushionberry tampering with the EKG as those defendants were not tampering with the EKG. Nixon Aff. ¶ 7. Accordingly, summary judgment will be entered in favor of defendant Nixon.

Defendant Alisa Williams

Plaintiff alleges that defendant Alisa Williams denied him medical care by prescribing anxiety medication that had a "bad effect" on him and failing to make "a request or referral to have [him] seen for the test that she knew needed to be done. Pl's Opp'n Mot. Summ. J. 2 of 12, docket no. 95. Yet, this too is contradicted by the evidence. Plaintiff's medical record show that he initially complained of anxiety and that he was placed on different anti-anxiety pills, including his own request to be prescribed Prozac. Defs' Mot. Summ. J. Ex. A; docket no. 81-1; Alisa Williams Aff. ¶ 8. Defendant Alisa Williams repeatedly saw plaintiff, often per his own request. At each appointment defendant Alisa Williams sought to treat plaintiff's anxiety issues.

By May 7, 2012, after trying multiple anti-anxiety medications, defendant Alisa Williams

concluded the medication was not assisting plaintiff and she discontinued its use. Indeed, when

defendant Alisa Williams again saw plaintiff on July 8, 2012, he reported no difference in his

anxiety now from when he was on anti-anxiety medication. Plaintiff, thus, fails to show that

defendant Alisa Williams acted with deliberate indifference to his medical needs because

plaintiffs fails to show that defendant Alisa Williams was so "grossly incompetent, inadequate, or

excessive as to shock the conscience or to be intolerable to fundamental fairness." Estelle, 429

U.S. at 106. At best his allegations amount to a disagreement over his course of treatment by

defendant Alisa Williams, but such allegations cannot support a denial of medical care claim. See

Wright, 766 F.2d at 849.

Defendant Carolyn Williams

Plaintiff's allegations clearly show that he seeks to hold defendant Carolyn Williams's

liable based on her supervisory position. To establish supervisory liability under § 1983, a

plaintiff must demonstrate:

> (1) that the supervisor had actual or constructive knowledge that his subordinate
> was engaged in conduct that posed "a pervasive and unreasonable risk" of
> constitutional injury to citizens like the plaintiff; (2) that the supervisor's response
> to that knowledge was so inadequate as to show "deliberate indifference to or tacit
> authorization of the alleged offensive practices,"; and (3) that there was an
> "affirmative causal link" between the supervisor's inaction and the particular
> constitutional injury suffered by the plaintiff.

Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted). Here, plaintiff does not allege

any facts to demonstrate that these factors were present as to defendant Carolyn Williams. As

such, there is no genuine issue of material fact and defendant Carolyn Williams will be granted

summary judgment. See Matsushita, 475 U.S. at 587.

19

## V. Conclusion

For the above-stated reasons, defendants Branch and Burnett's joint Motion for Summary Judgment will be granted, in part, and denied, in part, without prejudice to their ability to submit supplemental briefing as to the issue of whether plaintiff was denied due process during, or by not receiving, his disciplinary hearing. Defendants Cushionberry, Motsumi Moja, Nixon, Williams, Alisa Williams, and Carolyn Williams's joint Motion for Summary Judgment will be granted. An appropriate order shall issue.

Entered this ____ day of _____ 2014.

_____/s/_____

Gerald Bruce Lee
United States District Judge

Alexandria, Virginia